UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHER DIVISION

JAMES STEVENS, JR.,

    Plaintiff,

v.

Case No. 10-CV-12421
HON. GEORGE CARAM STEEH

ESTES EXPRESS LINES,

    Defendant.
_____/

OPINION AND ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [#11] AND DISMISSING COMPLAINT

I.  INTRODUCTION

On May 14, 2010, plaintiff, James Stevens, Jr., filed the instant action alleging that defendant, Estes Express Lines, violated Michigan's Elliot Larsen Civil Rights Act (ELCRA), MICH. COMP. LAWS § 37.2101 et seq., when defendant disciplined and later terminated his employment in retaliation for plaintiff's complaint that another employee was sexually harassing him.  Defendant timely removed the matter to this court on June 21, 2010 invoking this court's diversity jurisdiction. On February 22, 2011, after discovery, defendant filed a motion for summary judgment.  The parties fully briefed their respective positions and oral argument occurred on May 24, 2011.  For the reasons that follow, defendant's motion for summary judgment is GRANTED.

II.  BACKGROUND

Plaintiff was hired by defendant on September 26, 2006.  Defendant is in the freight transportation business and operates its business from facilities, known as terminals,

located throughout the Eastern United States. Plaintiff was initially hired as a dock worker at defendant's Flint, Michigan terminal. Plaintiff was transferred to defendant's new location in Romulus, Michigan (Detroit terminal) on September 24, 2007 and held the position of Outbound Dock Supervisor at this location. He reported to terminal manager Mike Richardson. As the Outbound Dock Supervisor, plaintiff was responsible for the entire terminal at night. His shift began at 2:00 p.m. and ended at midnight, Monday through Friday. Plaintiff supervised roughly forty dock workers, drivers and clerical workers. Tom Cloutier was another supervisor who worked the same shift as plaintiff. Roxanne Branch was the Office Manager at the Detroit terminal. Montell Maners was the Regional Human Resources Manager for the region which encompassed the Detroit terminal. Brenda Gerczak is the Director of Human Resources for the entire company and her office is located in Richmond, Virginia.

Plaintiff's Alleged Protected Activity

Maners was newly assigned to the region encompassing the Detroit terminal and arrived for a planned visit to that facility on October 15, 2008 and October 16, 2008. When he arrived he was informed that several of the employees wished to speak with him about issues at the Detroit terminal. Several of the employees sought to discuss plaintiff's conduct in private. Maners interviewed several male and female employees and gathered statements from them complaining about plaintiff's management style.

The male employees complained to Maners that plaintiff treated employees in an unprofessional manner, disciplining and berating them in front of other employees, spoke in derogatory terms about employees to their co-workers, and used abusive language of a sexual nature when talking about females. The female employees complained that

plaintiff used offensive curse words while at the workplace, specifically the "F" word, "MF," "MF-er," and "GD," and told the employees that "my friend hits that" indicating that his friend was having sexual intercourse with employee Tonya Novak. Plaintiff referred to Novak as the "pretty girl in the window," and mocked his subordinates, referring to them as "stupid" or as "dumbasses." The employees further complained that he could not control his temper, that he yelled and screamed all night, and that he created an abusive and hostile work environment. Maners gathered written statements from all of the employees on October 16, 2008.

In addition to these complaints, Maners received a statement from Kathryn LeClerc, an hourly Yard Switcher, concerning improper conduct on the part of the plaintiff as a supervisor, and her allegation that plaintiff had engaged her to perform oral sex on him while the two of them were alone in the terminal manager's office late one night. LeClerc admitted to having a flirtatious relationship with the plaintiff over a period of time which culminated in her performing oral sex on him. Maners asked that LeClerc reduce her version of what happened to a statement and she did so in a seven page handwritten document.

Maners interviewed the plaintiff, and plaintiff admitted that he had arguments with people, that he was loud and that he had indeed called Novak the "pretty girl in the window," and that he used curse words. However, he denied that he used sexually derogatory and vulgar language. Plaintiff also denied all of the facts in LeClerc's statement. Plaintiff asserts that he was being sexually harassed by LeClerc. As proof, he provided Maners with a copy of a note that LeClerc had given to the plaintiff. Plaintiff explained that he had been given the note at least two months earlier. He kept the note

3

because he thought LeClerc might make some accusation against him in the future, but did not report it to upper management or human resources because he was embarrassed. He did not reprimand LeClerc even though it was his duty as her supervisor. The note stated "because it would be a perfect way to slap your ass and cop a feel at the same time."

Maners spoke with LeClerc and she admitted to writing the note. Maners gave her a written warning. Maners concluded that there was no corroboration or verifying witnesses to LeClerc's accusations of sexual harassment. Therefore, on October 17, 2008, plaintiff was given a first and final written warning, not for any misconduct on the part of plaintiff towards LeClerc, but for his abusive, intimidating and improper conduct towards the employees he supervised and for creating a hostile work environment.[1] The first and final written warning states:

> Describe the misconduct and explain the negative impact on the employee and the Company: Violation of the Company code of Conduct with respect to harassment and the use of abusive, vulgar and profane language to include all actions of a sexual nature. Offensive or improper conduct in failing to treat with respect to courtesy with others you work with and supervise. This is the first and final warning.

See Def.'s Mot. for Summ. J., Ex. B. Plaintiff signed the October 17, 2008 warning. Id.

---

[1] Plaintiff alleges in his complaint that this final written warning was done in retaliation for his charge of sexual harassment, however at his deposition he appears to state that the October 17, 2008 written warning is not part of the facts upon which he relies in support of his claim:

> Q: And that the bottom line is, if Montell [Maners] had numerous people that said that you engaged in that, the majority of Exhibit 17 that I'm about to mark, which the October 17, 2008 write-up, if he had numerous people stating and corroborating that you engaged in this conduct it was proper for him to give you this even if you denied it; correct?
>
> A: Yes. I would say yes.

<u>Performance and Discipline After October of 2008</u>

On November 11, 2008, plaintiff received a disciplinary write up and counseling for his failure to provide the proper paperwork to an employee who was injured on the job and for his failure to ensure that the injured employee take a mandatory drug test. The employee was LeClerc. Subsequent to this incident, plaintiff was counseled by Richardson for yelling and screaming at a driver, Don Fox. Richardson received witness statements alleging that plaintiff was yelling at his subordinate, Fox. Plaintiff also had a confrontation with the other supervisor working the night shift, Cloutier. Richardson met with both plaintiff and Cloutier and counseled them that they must act professionally.[2]

<u>The Technicolor Warning</u>

In March of 2009, defendant obtained a new and large customer account with Technicolor. Richardson held a meeting and informed all of the dock supervisors that the Technicolor account was special and that pallets of freight containing boxes of Technicolor product were not to be broken down or taken apart. The pallets contained shipments of music CDs or video DVDs that were being shipped to various retail outlets that had advertised specific dates for the release of the CDs and DVDs, therefore the shipments were required to arrive on the exact date that was advertised, not one day before nor one day after the advertised date. While Richardson claims that plaintiff was present at this meeting, plaintiff does not recall being in attendance.

On April 9, 2009, plaintiff made the decision to break down nine of the twelve pallets of Technicolor freight, even though he did not have permission to do so. As a result,

---

[2] It does not appear that plaintiff relies on any of the described disciplinary actions in support of his claim.

fourteen cartons of DVDs were separated from the order and were not delivered on time to meet the retailer's advertised release date.  Defendant also lost any future business from Technicolor.   Plaintiff received a written warning on April 13, 2009 for his failure to follow instructions from his managers.  Plaintiff wrote "understood" and signed the April 13, 2009 warning.

### The Gold Medal Final Warning

On June 15, 2009, plaintiff received a final written warning and disciplinary suspension for insubordination and failure to follow a direct order from Richardson.  A Gold Medal shipment is considered a priority shipment.  The shipper pays extra for defendant's guarantee of delivery on a certain date.  If the shipment fails to arrive, defendant is not paid.   Before Richardson left the terminal on June 12, 2009, he was instructed by upper management and, in turn, instructed plaintiff to route the Gold Medal shipment through the Indianapolis hub terminal rather than the Nashville hub where it would normally have gone.  Plaintiff did not follow Richardson's directions; he claims that he contacted someone whose name he cannot recall in the Gold Medal dispatch office and was told to send the shipment through Nashville.  This resulted in a service failure.

### Events Leading to Plaintiff's Termination

After working the 2:00 p.m. to midnight shift, which was not her usual shift, Branch, the Office Manager, told Richardson that she observed plaintiff yelling at the dockworkers, yelling at Cloutier, intimidating and threatening the dockworkers and drivers, talking about various employees when they were out of the room to other employees, getting into an argument with a driver, and generally creating a hostile work environment.  Richardson commenced an investigation and gathered statements from the witnesses who worked for

and were around plaintiff at night.

Other employees including Michelle Murphy, Sandra Parker, James Young, and Jim Gambino corroborated Branch's description of plaintiff's actions during his shift, specifically that he used foul language, made fun of employees, yelled constantly, talked down to employees and made derogatory comments about people who practiced different religious faiths than his own. When questioned by Richardson, plaintiff denied all of the employees' statements.

Richardson passed the witness statements that he gathered along with plaintiff's disciplinary history to the Director of Human Resources, Brenda Gerczak. Gerczak reviewed the information provided and found that there was verification and corroboration of many violations of defendant's Code of Conduct on the part of plaintiff. Based on her review, Gerczak determined that plaintiff should be terminated. Gerczak provides her February 15, 2011 affidavit describing her decision to terminate plaintiff's employment:

> My review of the information provided indicated that Mr. Stevens had a final warning less than a year earlier for abusing and intimidating employees, using foul, profane and sexually explicit language in the workplace, and for creating a hostile work environment. This final written warning was issued to him on October 17, 2008. Indeed, I observed that he had another counseling and warning prior to October 17, 2008 regarding his mistreatment of employees. The evidence I reviewed indicated that Mr. Stevens continued to act unprofessionally and failed to follow instructions after October, 2008. He had received the Technicolor written warning. He had received another final written warning concerning a Gold Medal shipment for which he was suspended because of his failure to follow directions in June, 2009. And, after all this, he had continued to engage in abusive, inappropriate, profane, vulgar and unlawful language and treatment of those persons who worked for him and with him. He was mistreating his employees and creating a hostile work environment in violation of Estes' policy. He had engaged in insubordinate conduct and failed to follow instructions given to him about which he had previously been warned. As such, I made the decision to terminate Mr Stevens' employment for those reasons.

See Def.'s Mot. for Summ. J., Ex. F at ¶ 7. Gerczak had no knowledge that plaintiff made a sexual harassment claim against LeClerc.

### III. STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); see also, Cox v. Kentucky Dept. of Transp., 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also National

Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

## IV. ANALYSIS

Summary judgment is appropriate because plaintiff cannot establish a *prima facie* case under the ELCRA, nor demonstrate that defendant's reasons for its adverse actions were pretextual and based on a retaliatory motive. The ELCRA prohibits an employer from retaliating against an employee who opposes a violation of the Act or makes a charge, files a complaint, or participates in an investigation under the Act. See MICH. COMP. LAWS § 37.2701(a). In order to establish a *prima facie* case of retaliation under the ELCRA, plaintiff must establish: "(1) that [he] engaged in a protected activity; (2) that this was known to the defendant; (3) that the defendant took an employment action adverse to [him]; and (4) that there was a causal connection between the protected and the adverse employment action." Barrett v. Kirtland Community College, 245 Mich. App. 306, 315; 628 N.W.2d 63 (Ct. App. 2001).

First, plaintiff cannot show that he engaged in a protected activity. Plaintiff alleges

9

that he engaged in a protected act when he participated in Maners' sexual harassment investigation and when he made a report of sexual harassment to Maners. "[A]n employee need not specifically cite the [ELCRA] when making a charge under the act." Id. at 319. However, "the employee must do more than generally assert unfair treatment[,] ... [he] must clearly convey to an objective employer that the employee is raising the specter of a claim of unlawful discrimination . . . ." Id. The ELCRA defines unlawful sexual harassment as "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature" where the conduct or communication "has the purpose or effect of substantially interfering with an individual's employment" or "creating an intimidating, hostile, or offensive employment . . . ." MICH. COMP. LAWS. § 37.2701(I). Sexual harassment is actionable

> only if it is so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment. Workplace conduct is not measured in isolations; instead, whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

Gray v. Michigan Minority Business Development Council, no. 276693, 2008 Mich. App. LEXIS 1958, *6 (Ct. App. Sept. 18, 2008) (citing Clark Co. School Dist. v. Breeden, 532 U.S. 268, 270 (2001)).

In his complaint, plaintiff does not convey that he is raising the specter of unlawful discrimination. While plaintiff provided the note from LeClerc to refute a sexual harassment allegation against him, this does not demonstrate actionable sexual harassment. He provides no evidence that the sexual advance was unwelcome, let alone that it substantially interfered with his employment as LeClerc's supervisor, or created an intimidating, hostile,

or offensive employment environment.

Second, plaintiff cannot establish a causal connection between the alleged protected activity and defendant's adverse employment action. To establish a causal connection, plaintiff must show that his participation in an activity protected by the ELCRA was a "significant factor" in the employer's adverse employment action, not just that there was a causal link between the two. See Barrett, 245 Mich. App. at 315. "[P]roof of temporal proximity, between the protected activity and the adverse employment action, without more, is not sufficient to support a finding of a causal connection." Reisinger v. Ann Arbor Nights, Inc., No. 07-cv-13208, 2008 U.S. Dist. LEXIS 10735, at *31 (E.D. Mich. Nov. 25, 2008). Plaintiff argues that he began experiencing negative responses from management immediately after his report of sexual harassment. However, partaking in a protected activity under the ERCLA, such as participating in an investigation under the Act, does not provide ultimate immunity from termination. Plaintiff has not established that Gerczak had any knowledge of plaintiff's charge of sexual harassment to Maners in October of 2008. See Miller v. CVS Pharmacy, Inc., No. 09-13667, 2011 U.S. Dist. LEXIS 25769, at *32-33 (E.D. Mich. March 14, 2011) (granting summary judgment as to ELCRA retaliation claim where plaintiff presented no evidence that individual who made the decision to discharge had knowledge of protected activity).

Third, if a plaintiff establishes a *prima facie* case, the burden shifting analysis under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)[3] applies and a defendant may

---

[3] Michigan courts look to the McDonnell-Douglas framework in resolving claims under the ELCRA. See Radtke v. Everett, 442 Mich. 368, 381-82; 501 N.W. 2d 155 (1993); see also, Barrett, 245 Mich. App. at 314-15 ("In interpreting provisions of the CRA, we are guided by federal court interpretations of the counterpart statute . . .

rebut the plaintiff's *prima facie* case by articulating a "legitimate, non-discriminatory reason" for the adverse employment action. See Morris v. Oldham County Fiscal Ct., 201 F.3d 784, 792 (6th Cir. 2000); Smith v. Chrysler Corp., 155 F.3d 799, 805 (6th Cir. 1998) (When a plaintiff establishes a *prima facie* case, "a mandatory presumption of discrimination is created and the burden shifts to the employer to proffer a non-discriminatory reason for" the adverse employment action). Here, defendant had legitimate, non-discriminatory business reasons for each of the adverse employment actions taken against the plaintiff. Further, plaintiff has failed to provide any support to contradict these legitimate, non-discriminatory reasons.

"If the employer is able to sustain its burden, then the mandatory presumption evaporates into a permissive inference, and the burden shifts back to the employee to show by a preponderance of the evidence that the employer's proffered reason for discharge was actually a pretext intended to hide unlawful discrimination." Id. "An employee can show pretext by offering evidence that the employer's proffered reason had no basis in fact, did not actually motivate its decision, or was never used in the past to discharge an employee." Id. at 805-06 (citing Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 883 (6th Cir. 1996)). Defendant's decisions to issue written warnings and, ultimately to terminate plaintiff's employment, were based upon good faith, substantial evidence and an honestly held belief that plaintiff had violated company policy which warranted discipline and discharge. Plaintiff does not refute that defendant received numerous complaints from male

---

.[w]hile we are not bound by federal precedent based on Title VII, those precedents analogous to questions presented under the CRA are persuasive and will be afforded substantial consideration.")

and female employees working under plaintiff's supervision in October of 2008 and July of 2009.

Plaintiff argues that defendant's adverse employment decisions were pretextual because Richardson was aware of plaintiff's propensity to yell and curse on the job prior to his first and final written warning in October of 2008. Further, plaintiff received a merit pay increase in early October of 2008. However, Richardson was aware that plaintiff was a "little rough around the edges" and abrasive in how he dealt with subordinates, but was not aware until Maners' investigation in October 2008 that the plaintiff was engaged in more serious abuse, such as threatening employees; making improper and derogatory sex, age and religious comments; belittling and berating employees; and generally creating a hostile work environment. Further, there is evidence that plaintiff received discipline prior to October of 2008, specifically he was given a written warning in January of 2008 for his unprofessional management style.

For the reasons stated above, there is no genuine issue for trial on plaintiff's ELCRA claim and defendant is entitled to summary judgment.

## V.  CONCLUSION

Accordingly,

Defendant's motion for summary judgment is GRANTED.

Plaintiff's complaint is DISMISSED.


SO ORDERED.

Dated: June 28, 2011

                                           S/George Caram Steeh
                                           GEORGE CARAM STEEH

UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on June 28, 2011, by electronic and/or ordinary mail.

S/Josephine Chaffee
Deputy Clerk